Westlaw.

797 F.2d 43                                                                                                                Page 1

797 F.2d 43

**(Cite as: 797 F.2d 43)**

▷

United States Court of Appeals,
First Circuit.
TERADYNE, INC., Plaintiff, Appellee,
v.
MOSTEK CORP., Defendant, Appellant.
No. 86-1225.

Argued May 8, 1986.
Decided Aug. 1, 1986.

Electronic memory repair systems supplier sued semiconductor components manufacturer for damages attendant upon cancellation of orders. The United States District Court for the District of Massachusetts, Joseph L. Tauro, J., issued interlocutory order enjoining manufacturer from disposing of assets sufficient to satisfy any judgment or arbitration award obtained by supplier, and manufacturer appealed. The Court of Appeals, Bownes, Circuit Judge, held that: (1) order was to be treated as appealable preliminary injunction; (2) Federal Arbitration Act did not prevent district court from granting preliminary injunctive relief; (3) issuance of order treated as preliminary injunction was not abuse of discretion; and (4) court's findings in support of preliminary injunction that supplier had exhibited likelihood of success on merits was not abuse of discretion.

Affirmed.

West Headnotes

**[1] Federal Courts** ☞573
170Bk573 Most Cited Cases
Order enjoining semiconductor component manufacturer in liquidation from disposing of or encumbering sufficient amount of assets to satisfy any judgment or arbitration award obtained by supplier in ongoing breach of contract action was to be treated as appealable preliminary injunction. 28 U.S.C.A. §§ 1292, 1292(a)(1).

**[2] Arbitration** ☞10.10
33k10.10 Most Cited Cases
(Formerly 33k7.9)
Preliminary injunctive relief enjoining electronics manufacturer from disposing of or encumbering sufficient amount of assets to satisfy any judgment or arbitration award obtainable by supplier in ongoing breach of contract action was not precluded by Federal Arbitration Act notwithstanding that court did not rule on arbitrability of dispute; declining to follow *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hovey*, 726 F.2d 1286 (8th Cir.). 9 U.S.C.A. §§ 3, 4.

**[3] Injunction** ☞138.37
212k138.37 Most Cited Cases
(Formerly 212k138.36)
Preliminary injunction enjoining electronics manufacturer in liquidation from disposing of or encumbering sufficient assets to satisfy any potential judgment or arbitration award obtained by supplier in ongoing breach of contract action was not abuse of discretion where, notwithstanding that realized assets far exceeded claims, no assurances were given that, after liquidation, manufacturer would be able to pay supplier's potential judgment, and supplier demonstrated likelihood of success on merits.

**[4] Injunction** ☞138.37
212k138.37 Most Cited Cases
(Formerly 212k138.36)
Court's conclusion that electronic supplier had shown likelihood of success on merits of breach of contract claim against manufacturer, for lost profits, incidental, and consequential damages from order cancellations, was not abuse of discretion where manufacturer's argument that contract did not arise through purchase orders materially altering quantity purchase agreement alleged to have been merely quotation of prices was tenuous and argument that orders were void for duress, due to advantaged position of supplier, did not make out prima facie

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



797 F.2d 43            Page 2

797 F.2d 43

**(Cite as: 797 F.2d 43)**

case, absent indication that supplier caused or contributed to manufacturer's financial difficulties. U.C.C. §§ 2-207, 2-209.

*44 Carol Goodman, with whom Mark F. Walter and LeBoeuf, Lamb, Leiby & MacRae, New York City, were on brief, for defendant, appellant.

Bernard J. Bonn, III, with whom Ronald T. Gerwatowski and Testa, Hurwitz & Thibeault, Boston, Mass., were on brief, for plaintiff, appellee.

Before COFFIN, BOWNES and TORRUELLA, Circuit Judges.

BOWNES, Circuit Judge.

Defendant-appellant, Mostek Corporation (Mostek), now known as CTU of Delaware, Inc., appeals from a district court interlocutory order issued in favor of plaintiff-appellee, Teradyne, Inc. (Teradyne), in an ongoing breach of contract action by Teradyne against Mostek. The order enjoins Mostek from disposing of or encumbering $4,000,000 of its assets and directs it to set that amount aside in an interest bearing account to satisfy any judgment or arbitration *45 award obtained by Teradyne. Teradyne is claiming approximately $3,500,000 for cancellation charges, alleged failure to pay unearned price discounts on goods delivered, for goods and services invoiced, and for incidental and consequential damages. Alternatively, it seeks damages computed under the Uniform Commercial Code (U.C.C.) for lost profits, incidental and consequential damages. Teradyne has posted a $25,000 bond as directed by the district court's order.

Mostek's appeal raises three issues: (1) whether the district court's order should be treated as a **nonappealable attachment order or as a preliminary injunction appealable under 28 U.S.C. § 1292(a)(1);** [FN1] (2) whether the district court lacked power because of the Federal Arbitration Act, 9 U.S.C. §§ 1-14, to issue the order; and (3) whether the court abused its discretion in issuing the order.

    FN1. 28 U.S.C. § 1292(a)(1) provides in pertinent part:

§ 1292. Interlocutory decisions (a) Except as provided in subsections (c) and (d) of this section, the courts ppeals shall have jurisdiction of appeals from:
(1) Interlocutory orders of the district courts granting, continuing, modifying, refusing or disolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court.

Mostek manufactured, designed and marketed semiconductor components for use in computers, telecommunications equipment and other end products. Teradyne manufactures laser systems (sometimes called memory repair systems) and memory testers, both of which were key to Mostek's manufacturing operations.

The present dispute erupted when, on May 24, 1985, Mostek cancelled orders for memory testers and laser systems it had given Teradyne and then cancelled a second set of orders on July 25, 1985. When Teradyne proceeded to demand cancellation charges assessed at 70% of the original purchase price, Mostek refused to pay. On September 26, 1985, Teradyne, relying on an arbitration clause in the contract, filed a demand for arbitration against Mostek with the American Arbitration Association. Mostek opposed that demand.

Changes in Mostek's corporate status complicated matters when United Technologies Corporation, which had acquired Mostek in 1980, announced, on October 17, 1985, that Mostek would cease operations. On October 30, United and Mostek entered into a Memorandum of Understanding with Thomson Semiconductors, Inc., under which Thomson agreed to buy substantially all of Mostek's assets for approximately $71 million in cash, subject to certain offsets and debits. The sale was executed in November and Teradyne was contemporaneously notified that it had occurred.
The proceeds of the sale were deposited in a separate bank account in Mostek's name and dedicated to the payment of the claims of Mostek's creditors. Prompted by this change in Mostek's status, Teradyne commenced this action on January

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

17, 1986, seeking, *inter alia,* an injunction requiring Mostek to set aside sufficient funds to satisfy a Teradyne judgment pending the outcome of arbitration.

I. THE APPEALABILITY OF THE DISTRICT COURT'S ORDER

[1] *Trustees of Hospital Mortgage Group v. Compania Aseguradora,* 672 F.2d 250 (1st Cir.1982), is the only case in this circuit bearing on the question of whether an interlocutory order which is similar in effect to an attachment should be treated as a nonappealable attachment or a preliminary injunction appealable under 28 U.S.C. § 1292(a)(1). [FN2] That case involved an action by the plaintiff trustees to foreclose *46 on a mortgage on certain plots of land. The district court issued an order requiring the defendant to either post a bond of $67,167.09 with the court securing its mortgage liability or satisfy its property tax liability on the mortgaged realty and repay the plaintiffs for taxes advanced on the defendant's behalf. The defendant appealed, contending that the order was an abuse of the district court's discretion. We held that the order was not appealable; that it was not an injunction under 28 U.S.C. § 1292(a)(1) because it did not constrain the defendant in any way beyond restricting its use of the bond money during the pendency of the litigation. 672 F.2d at 251. We noted that allowing such "minimally coercive orders" to be appealed as injunctions under § 1292(a) would make any order relating to a bond immediately appealable, and held the appellant's situation "indistinguishable from that of the subject of an attachment order." *Id.*

FN2. § 1292. Interlocutory decisions
(a) Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:
(1) Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court[.]

We find that the order in the present case is distinguishable from the order in *Compania Aseguradora* for three reasons. First, the order here is more than "minimally coercive." The tying up of four million dollars pending the outcome of arbitration proceedings is a significant constraint, the fact that it can be put in an interest bearing account notwithstanding. Second, although we recognize that the label used by the parties in the district court cannot control appealability, *see* 16 Wright, Miller, Cooper & Gressman, *Federal Practice and Procedure* § 3922 at 32 (1977), we think it significant that the district court and the parties treated the order as a preliminary injunction. Teradyne specifically asked for injunctive relief and the order followed two temporary restraining orders in Teradyne's favor. Moreover, the court described the order as a preliminary injunction in its memorandum and granted the order on the basis of its findings that Teradyne had met the prerequisites for injunctive relief. Third, and we think this is the most compelling reason, this case, unlike *Compania Aseguradora,* does not merely involve posting a bond or surrendering property for attachment. Here, as with a traditional injunction, Mostek has been ordered to refrain from certain conduct and to affirmatively take certain action. We think it advisable, however, to look beyond our own circuit for guidance.

The Second Circuit has discussed this issue definitively in at least two cases. In *Inter-Regional Financial Group, Inc. v. Hashemi,* 562 F.2d 152 (2d Cir.), *cert. denied,* 434 U.S. 1046, 98 S.Ct. 892, 54 L.Ed.2d 798 (1978), it held that an order directing defendant to deliver certain stock certificates to the custody of the the clerk as security for any judgment was appealable pursuant to 28 U.S.C. § 1292(a)(1). The court treated the order as an injunction because the defendant was required to bring the certificates to the clerk from outside the venue state of New York, as "a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

797 F.2d 43

797 F.2d 43

(Cite as: 797 F.2d 43)

Page 4

necessary step preceding the actual attachment." *Id.* at 154. The case of *In re Feit & Drexler, Inc.,* 760 F.2d 406 (2d Cir.1985), concerned an order prohibiting an individual and those holding property for her or acting in concert with her from transferring or disposing of any of the individual's property except on order of the court and ordering her, her agents and employees and those holding property for her or acting in concert with her to deliver her property to her attorney who was to hold the property in safekeeping pending further order of the district court. The court saw no basis for distinguishing this order from the order held appealable in *Hashemi. Id.* at 412.

The Seventh Circuit reached a different conclusion in *Rosenfeldt v. Comprehensive Accounting Service Corporation,* 514 F.2d 607 (7th Cir.1975). In an opinion authored by Judge (now Justice) Stevens, it held that an order directing plaintiffs to deliver to defendants all accounts/clients, accounts receivable, books, records, files and work papers and restraining plaintiffs from certain specific activities was not appealable. The court held that the motion "was, in effect, a petition for a writ of attachment or replevin pursuant to Federal Rule of Civil Procedure 64" and stressed that it was so treated by the parties and the district *47 court. *Id.* at 609. *Rosenfeldt* has been criticized for not recognizing that the order had all of the ingredients of an injunction. *See* 16 Wright, Miller, Cooper & Gressman, *Federal Practice and Procedure* § 3922 at 44. A close reading of Judge Steven's opinion, however, suggests that he was influenced by the particular circumstances of the case and the consequences of allowing an appeal. He pointed out that holding the order appealable would result in disparate treatment of secured parties contrary to the pertinent provisions of the Uniform Commercial Code. 514 F.2d at 610.

The question of whether an interlocutory order which has the attributes of both an attachment and an injunction should be treated for appeal purposes as an attachment or an injunction depends upon the terms of the order. Factors to be considered are: the present and future consequences of the constraint involved; whether the order directs or restrains conduct of one of the parties; how the order was treated below by the district court and the parties. Considering all of these factors, we hold that the district court's order should be treated as a preliminary injunction appealable under § 1292(a)(1).

II. THE EFFECT OF THE FEDERAL ARBITRATION ACT, 9 U.S.C. §§ 1-14, ON THE DISTRICT COURT'S POWER TO GRANT PRELIMINARY INJUNCTIVE RELIEF

[2] Mostek contends that the policy of the Arbitration Act precludes the grant of preliminary injunctive relief in an arbitrable dispute. The district court has not yet determined whether or not this dispute is arbitrable. If Mostek's argument is correct, then it clearly would have been an abuse of discretion for the court to issue this injunction before deciding the arbitrability question. If Mostek's argument is not correct, however, and the Arbitration Act poses no bar to the grant of a preliminary injunction, then whether or not the dispute is arbitrable is irrelevant. Accordingly, the initial question to be determined is whether or not a preliminary injunction can be issued in an arbitrable dispute.

The Arbitration Act does not address this issue specifically and it has not previously been ruled upon by this circuit. Other circuits, however, have examined the issue in some detail. The Second, Fourth and Seventh Circuits all take the view that a court can, and should, grant a preliminary injunction in an arbitrable dispute whenever an injunction is necessary to preserve the status quo pending arbitration.

In *Roso-Lino Beverage Distributors, Inc. v. The Coca-Cola Bottling Company of New York,* 749 F.2d 124 (2d Cir.1984), the Second Circuit reversed the district court's denial of a preliminary injunction because it "appear[ed], from the record ..., that the district court believed its decision to refer the dispute to arbitration stripped the court of the power to grant injunctive relief." *Id.* at 125. Relying on its decision in *Erving v. Virginia Squires Basketball Club,* 468 F.2d 1064 (2d Cir.1972), the Second

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

797 F.2d 43

Page 5

797 F.2d 43

(Cite as: 797 F.2d 43)

Circuit held that the fact that the dispute was to be arbitrated did not "absolve the court of its obligation to consider the merits of a requested preliminary injunction," and that the proper course for the district court was to determine whether the dispute was a "proper case" for an injunction. 749 F.2d at 125.

*Erving v. Virginia Squires Basketball Club,* 468 F.2d 1064, involved a suit by a basketball player for rescission of his contract with a professional club. The club counterclaimed, asserting a right to arbitration, and sought injunctive relief. The district court granted a preliminary injunction enjoining the plaintiff from playing for any other club pending determination of the dispute by arbitration. The Second Circuit affirmed, noting that the injunction was the only way to preserve the status quo during the pendency of the arbitration proceeding. *Id.* at 1067.

The Fourth Circuit's examination of this issue, in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley,* 756 F.2d 1048 (4th Cir.1985), focused on the effect of § 3 of the Arbitration Act on the court's power to *48 issue preliminary injunctive relief. Section 3 provides that the court shall, upon determination that a dispute is arbitrable, and on application of one of the parties, "stay the trial of the action until such arbitration has been had." [FN3] Merrill Lynch sued Bradley, a former account executive, for damages for alleged breach of contract, and sought injunctive relief to prevent Bradley from using its records and soliciting its clients. The district court granted Merrill Lynch a preliminary injunction, denied Bradley's motion to stay the injunction, and ordered expedited arbitration, both parties having agreed that the dispute was arbitrable. Bradley appealed, claiming that the injunction was an abuse of discretion because § 3 of the Arbitration Act precluded a court from considering the merits of an arbitrable dispute. The Fourth Circuit rejected this argument, holding that nothing in § 3 abrogated the equitable power of district courts to enter preliminary injunctions to preserve the status quo pending arbitration. *Id.* at 1052. The court also stated that it thought its decision would further rather than frustrate the policies underlying the Arbitration Act by ensuring that the dispute resolution would be a meaningful process. *Id.* at 1054.

> FN3. 9 U.S.C. § 3 provides:
> § 3. Stay of proceedings where issue therein referable to arbitration
> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

The issue was addressed by the Seventh Circuit in *Sauer Getriebe KG v. White Hydraulics, Inc.,* 715 F.2d 348 (7th Cir.1983), *cert. denied,* 464 U.S. 1070, 104 S.Ct. 976, 79 L.Ed.2d 214 (1984). The dispute in that case arose when the defendant announced that it was negotiating for the sale of its assets. The plaintiff claimed this announcement amounted to a repudiation of a previous agreement the defendant had made with the plaintiff to buy certain of the defendant's manufacturing rights. The complaint alleged that plaintiff intended to exercise its contractual right to arbitrate the dispute and contained a request for a preliminary injunction barring the defendant from transferring any manufacturing rights pending the arbitration. The district court denied injunctive relief on the grounds that the defendant had not repudiated the contract. The Seventh Circuit reversed. In doing so, it expressly rejected the defendant's argument that the plaintiff had waived its right to arbitrate by filing the suit. The court held that the right to arbitrate and to seek injunctive relief were not incompatible and that the plaintiff was not obliged to abandon one in order to pursue the other. 715 F.2d at 350. It held, further, that the plaintiff was entitled to an injunction pending the arbitration, noting that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 6

797 F.2d 43

797 F.2d 43

(Cite as: 797 F.2d 43)

plaintiff's contractual right to arbitrate the dispute would not be worth much if the defendant transferred the manufacturing rights before the arbitration was settled. *Id.*

Running counter to the approach taken by the Second, Fourth and Seventh Circuits is that taken by the Eighth Circuit in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hovey*, 726 F.2d 1286 (8th Cir.1984), a case which the Fourth Circuit in *Bradley* expressly refused to follow. *Hovey* involved a petition by Merrill Lynch for an injunction against five former employees to prevent them from using Merrill Lynch's records and from soliciting Merrill Lynch clients. The employees counterclaimed, seeking to compel arbitration pursuant to New York Stock Exchange rules regulating dispute resolution procedures. The district court granted Merrill Lynch a preliminary injunction and refused to submit the dispute to arbitration. The employees appealed, claiming that the dispute was arbitrable. The Eighth Circuit held that the dispute was arbitrable and that issuing a preliminary injunction was, therefore, precluded by § 3 of the Arbitration Act. The *49 court took the view that granting preliminary injunctive relief in an arbitrable dispute ran counter to the "unmistakably clear congressional purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts." *Id.* at 1292 (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967)).

In support of this holding, the Eighth Circuit cited *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 22, 103 S.Ct. 927, 940, 74 L.Ed.2d 765 (1983) (the congressional intent of the Arbitration Act was to facilitate quick, expeditious arbitration); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), and *Buffalo Forge Co. v. United Steelworkers of America, AFL-CIO*, 428 U.S. 397, 412, 96 S.Ct. 3141, 3149-50, 49 L.Ed.2d 1022 (1976) (courts should not involve themselves in the merits of issues more appropriately left to arbitration). The Eighth Circuit construed these cases as "compelling authority to hold that, where the Arbitration Act is applicable and no qualifying contractual language has been alleged, the district court errs in granting injunctive relief." 726 F.2d at 1292. After careful consideration of the authorities relied upon by the Eighth Circuit, we conclude that they do not compel the conclusion that injunctive relief cannot issue in an arbitrable dispute.

The question at issue in *Moses H. Cone Memorial Hospital*, 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 was whether the federal district court should grant a stay of an action to compel arbitration out of deference to parallel litigation pending in state court. The defendant Hospital had moved for a declaratory judgment in state court, seeking a declaration that the dispute was not arbitrable. The plaintiff construction company then filed suit in federal court seeking an order compelling arbitration under § 4 of the Arbitration Act, which provides in pertinent part that a court must enter an order to arbitrate "upon being satisfied that the making of the agreement to arbitrate or the failure to comply therewith is not in issue." [FN4] On the Hospital's motion, the federal court stayed the federal suit pending resolution of the state court proceeding because both suits involved the identical issue of the arbitrability of the claims. The court of appeals reversed the stay order and remanded with instructions to enter an order to arbitrate. The Supreme Court affirmed, holding the district court's refusal to proceed erroneous "in view of Congress' clear intent, in the Arbitration Act, to move the parties to an arbitrable dispute out of court and into arbitration as quickly as possible." 460 U.S. at 22, 103 S.Ct. at 940. The Court noted that the Act "provides two parallel devices for enforcing an arbitration agreement: a stay of litigation in any case raising a dispute referable to arbitration, 9 U.S.C. § 3, and an affirmative order to engage in arbitration, § 4," and that both provisions call for *50 "an expeditious and summary hearing, with only restricted inquiry into factual issues." *Id.* It held that even if the state court did grant the construction company prompt relief under the Act, there still would have been a delay as a result of the district court's stay and that the stay thus "frustrated

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

797 F.2d 43

797 F.2d 43

(Cite as: 797 F.2d 43)

Page 7

the statutory policy of rapid and unobstructed enforcement of arbitration agreements." *Id.* at 23, 103 S.Ct. at 941. The issue in the present case is materially different from that in *Moses H. Cone.* The stay reversed there differed both in purpose and effect from the preliminary injunction here and we see nothing in the Supreme Court's reasoning to indicate that the Court would be opposed to the issuance of an order designed to preserve the meaningfulness of an arbitration agreement.

> FN4. Section 4 of the Arbitration Act provides in pertinent part:
> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Five days' notice in writing of such application shall be served upon the party in default. Service thereof shall be made in the manner provided by the Federal Rules of Civil Procedure. The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue.

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 involved an action for rescission of a contract based on alleged fraud in the inducement by the defendant, Flood & Conklin. Prima Paint's contention was that defendant had fraudulently represented it was solvent and able to perform whereas it was insolvent and planned to file for bankruptcy shortly after execution of the contract. Prior to filing suit, plaintiff notified defendant that it deemed it to have breached the contract. Defendant responded by filing a notice of intention to arbitrate, whereupon plaintiff filed suit in federal court for rescission and to enjoin defendant from proceeding with arbitration. The district court issued a stay of the action on the ground that the charge of fraud in the inducement was a question for the arbitrator and not for the court. The Second Circuit dismissed Prima Paint's appeal holding that a claim of fraud in the inducement generally, not directed to the arbitration clause itself, was for the arbitrator and not for the court. The Supreme Court affirmed.

The Court held that, in passing upon an application for a stay under § 3 of the Act, the scope of a court's inquiry was the same as the scope of inquiry afforded the court under § 4 when ruling upon whether the making of the agreement for arbitration is in issue. [FN5] 388 U.S. at 403, 87 S.Ct. at 1805-06. It ruled that § 4 would allow a court to adjudicate fraud in the inducement of the arbitration clause itself but not to adjudicate claims of fraud in the inducement generally, and that in considering a § 3 application, a court should likewise consider only issues relating to the making and performance of the agreement to arbitrate. *Id.* at 403-04, 87 S.Ct. at 1805-06. "In so concluding," the Court stated, "we not only honor the plain meaning of the statute but also the unmistakably clear congressional purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts." *Id.* at 404, 87 S.Ct. at 1806. Again, we see no incompatibility between the Court's language and the availability of preliminary injunctive relief to preserve the meaningfulness of the arbitration process. The risk that the arbitrator will be unduly influenced by the court's prior ruling is offset by the necessity of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

797 F.2d 43

797 F.2d 43

(Cite as: 797 F.2d 43)

Page 8

preserving the status quo.

    FN5. *See* note 4, *supra*.

The third Supreme Court case relied on by the Eighth Circuit, *Buffalo Forge Co. v. United Steelworkers of America*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 involved a petition by an employer for injunctive relief enjoining an ongoing work stoppage pending arbitration and the arbitrator's decision as to whether the stoppage was permissible under the no-strike clause of the collective bargaining agreement. The district court refused injunctive relief on the basis of § 4 of the Norris LaGuardia Act, 29 U.S.C. § 104, which imposes an express ban on federal court injunctions in labor disputes. The employer argued that the court was empowered to grant the injunction pursuant to § 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a), as construed in an earlier Supreme Court decision, *51 *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), which constituted an exception to the ban of the Norris LaGuardia Act. [FN6] The Second Circuit affirmed the denial of injunctive relief, as did the Supreme Court. 428 U.S. at 413, 96 S.Ct. at 3150. The Court held that the strike did not come within the *Boys Markets* exception and refused to undercut the policy of the Norris LaGuardia Act by extending that exception at the risk of involving the courts in a wide range of arbitrable disputes over collective bargaining agreements. The Arbitration Act contains no express ban such as that in § 4 of the Norris LaGuardia Act, and we believe that the difference in the policy considerations underlying both Acts warrants a different approach to the availability of preliminary injunctive relief in actions in which either Act is involved.

    FN6. In *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the Supreme Court reversed its earlier holding in *Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962), that the anti-injunction provisions of the Norris LaGuardia Act precluded a federal district court from enjoining a strike in breach of a no-strike obligation under a collective bargaining agreement, even though that agreement contained provisions, enforceable under § 301(c) of the Labor Management Relations Act of 1947, for binding arbitration of the grievance dispute concerning which the strike was called. The Court held that the literal terms of § 4 of the Norris LaGuardia Act must be accommodated to the subsequently enacted provisions of § 301(c) of the Labor Management Relations Act and the purposes of arbitration, equitable remedies to enforce which are essential to further congressional policy for peacefully resolving labor disputes. 398 U.S. at 253, 90 S.Ct. at 1594.

Having thus outlined our disagreement with both the reasoning and approach of the Eighth Circuit, we are persuaded that the approach taken by the Second, Fourth and Seventh Circuits should be followed. We hold, therefore, that a district court can grant injunctive relief in an arbitrable dispute pending arbitration, provided the prerequisites for injunctive relief are satisfied. We believe this approach reinforces rather than detracts from the policy of the Arbitration Act, which was most recently described by the Supreme Court in *Dean Witter Reynolds v. Byrd*, 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985): "passage of the Act was motivated first and foremost by a Congressional desire to enforce [arbitration] agreements into which parties had entered." 470 U.S. at ----, 105 S.Ct. at 1242. [FN7] We believe that the congressional desire to enforce arbitration agreements would frequently be frustrated if the courts were precluded from issuing preliminary injunctive relief to preserve the status quo pending arbitration and, *ipso facto*, the meaningfulness of the arbitration process. Accordingly, we hold that it was not error for the district court to issue the preliminary injunction before ruling on the arbitrability of this dispute. We next consider whether Teradyne established the prerequisites for such relief.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

797 F.2d 43

797 F.2d 43

(Cite as: 797 F.2d 43)

Page 9

FN7. The issue presented in *Dean Witter Reynolds* was whether a district court could deny a motion to compel arbitration of state law claims despite the parties' agreement to arbitrate their dispute when the complaint raised both federal securities and state law claims. It was argued that the Federal Arbitration Act's mandate to enforce arbitration agreements did not apply where it would result in bifurcated proceedings, on the ground that the Act's goal of speedy and efficient decision making would be thwarted by such proceedings. The Supreme Court rejected this argument, holding that the preeminent concern of Congress in passing the Act was to enforce private agreements into which parties had entered and that this concern required rigorous enforcement of agreements to arbitrate even though it resulted in piecemeal litigation. 470 U.S. at ---- - ----, 105 S.Ct. at 1242-44.

III. THE PROPRIETY OF PRELIMINARY INJUNCTIVE RELIEF

[3] In *Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006 (1st Cir.1981), we listed four criteria that must be established to warrant preliminary injunctive relief. The court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; *52 and (4) that the public interest will not be adversely affected by the granting of the injunction. The decision to grant or deny a preliminary injunction is a matter for the discretion of the district court and is reversible only for an abuse of discretion. The district court's decision will be reversed, however, if it is found to have applied an improper legal standard in determining the likelihood of success on the merits or if it has misapplied the law to the particular facts in issue. *Id.* at 1009.

The district court here clearly articulated its reasons for finding that Teradyne had satisfied the prerequisites for injunctive relief. It held that Mostek's freedom to dispose of its assets created a substantial risk of irreparable harm to Teradyne, given that Mostek was in the process of winding down after selling the bulk of its assets, that it had failed to provide adequate assurances to alleviate Teradyne's concerns, and that it could at any time make itself judgment proof. Further, the court found that the affidavits submitted to it showed a likelihood that Teradyne would succeed on its contractual claims, and that the balance of hardships was in Teradyne's favor. The court dismissed Mostek's claims that the injunction would create a ripple effect whereby the creditors would rush to court seeking similar relief, noting that the injunction would have no precedential effect on other disputed claims, and that Mostek could pay undisputed claims and thereby avoid any possible ripple effect on them. Mostek disputes all of the district court's findings. For ease of review, we will examine the court's findings on each criterion for preliminary injunctive relief separately. As there is no suggestion that the public interest was adversely affected by the injunction, that criterion is not relevant here.

A. *The Probability of Irreparable Harm to Teradyne and the Inadequacy of Legal Remedies*

Mostek contends that preliminary injunctive relief restraining the transfer of assets may not be granted in cases where monetary damages are available except in extraordinary circumstances. The question raised here is whether injunctive relief restraining the transfer of assets can be granted when the district court finds that the defendant may be insolvent before a final judgment is entered and, if so, whether such a finding was warranted in the circumstances of this case. The Supreme Court has held that a preliminary injunction, designed to freeze the status quo and protect the damages remedy is an appropriate form of relief when it is shown that the defendant is likely to be insolvent at the time of judgment. *Deckert v. Independence Shares Corporation*, 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

797 F.2d 43

797 F.2d 43

(Cite as: 797 F.2d 43)

Page 10

The facts of that case are analogous to the present, although somewhat more complex. The petitioners in *Deckert* were the owners of savings certificates purchased from Capital Savings Plan, Inc., which then merged with Independence Shares Corporation (Independence). The certificates required the holders to make installment payments to the Pennsylvania Corporation for Insurances on Lives and Granting Annuities (Pennsylvania). Pennsylvania, after deducting certain fixed charges, used the balance of these installment payments to purchase Independence Trust shares for the benefit of the certificate holders. Independence Trust shares, issued by Pennsylvania, represented interests in a trust of common stock of forty-two American corporations, deposited by Independence with Pennsylvania. Pursuant to a trust agreement between Pennsylvania and Independence, Pennsylvania collected dividends and profits from the stocks and administered the trust.

The petitioners sued Pennsylvania, Independence, and two affiliated companies, alleging that Independence and its predecessor, Capital Savings Plan, were guilty of fraudulent misrepresentations. They alleged, further, that Independence was insolvent and threatened with many lawsuits, that its business was virtually at a standstill, that preferences to creditors were probable, and that Independence's assets were in danger of dissipation. In addition to other relief, the petitioners asked for an *53 injunction restraining Pennsylvania from transferring or disposing of any of the assets of the corporations or of the trust. The district court granted the injunction, the court of appeals vacated it, and the Supreme Court reinstated it. The Court held that the legal remedy against Independence without recourse to the funds in the hands of Pennsylvania appeared inadequate in light of the allegations that Independence was insolvent and its funds in danger of depletion, and that the injunction was, therefore, "a reasonable measure to preserve the status quo pending final determination of the questions raised by the bill." 311 U.S. at 290, 61 S.Ct. at 234.

Several circuit courts have also recognized the propriety of injunctive relief in such circumstances. *See Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 386 (7th Cir.1984) (the requirement that a plaintiff seeking a preliminary injunction show that an award of damages will be inadequate does not require a showing that damages will be wholly ineffectual, it is sufficient if damages will for some reason be seriously deficient as a remedy for the harm suffered, for example, because the defendant may become insolvent before a final judgment can be entered and collected); *Productos Carnic, S.A. v. Central American Beef and Seafood Trading Co.,* 621 F.2d 683, 686 (5th Cir.1980) (even where plaintiff's remedy is limited to damages an injunction may issue to protect that remedy); *Foltz v. U.S. News & World Report,* 760 F.2d 1300, 1309 (D.C.Cir.1985) (a preliminary injunction enjoining distribution of cash from an employee profit-sharing plan, designed to freeze the status quo prior to a determination of liability and the extent of any damages, is not improper).

Having established that a preliminary injunction can be granted when it is necessary to protect the damages remedy, we turn to consider whether the record supports the district court's finding that such an injunction was necessary here. We believe that it does. Although Mostek realized assets far exceeding Teradyne's claims when the sale of its assets occurred, the record shows that those assets were being used to pay off creditors' claims and wind down expenses in what Mostek itself described as an "orderly liquidation process." Further, the amount Mostek received for its assets was stated to be subject to a number of unspecified offsets and debits and no assurances were given that Mostek would be able to pay a Teradyne judgment.

B. *The Balance of Hardships*

We agree with the district court that the balance of hardships tips in Teradyne's favor. Mostek has not shown why the district court's suggestion that it pay off undisputed claims would not avoid the ripple effect it alleges the injunction here will cause amongst its creditors. Nor has Mostek responded to the district court's position that the injunction, here, would have little precedential value, and, therefore, little ripple effect on disputed claims.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

797 F.2d 43

Page 11

797 F.2d 43

**(Cite as: 797 F.2d 43)**

Mostek was unable to point to any evidence of concrete harm when asked to do so at oral argument and conceded that as of that time there had been no ripples. Moreover, Mostek has done nothing to alleviate the court's concern that it will prove unable to satisfy a judgment in favor of Teradyne; the number of its creditors and of claims outstanding remain unspecified and no concrete assurances have been given by Mostek that it will have liquid assets sufficient to satisfy a judgment against it. Under these circumstances, we affirm the district court's conclusion that the possible hardship to Teradyne of having a $3-4 million judgment prove worthless, outweighed the inchoate hardship to Mostek of having $4 million of its assets tied up in an interest bearing account pending judgment.

C. *The Likelihood That Teradyne Would Succeed on the Merits*

This criterion requires a detailed exposition of the facts. Before Mostek ceased operations in 1985, Teradyne supplied virtually all its laser systems and memory testers. Mostek always bought from Teradyne pursuant to the terms of a Quantity Purchase Agreement (QPA). Each agreement, *54 provided *inter alia,* that Mostek would get price discounts on Teradyne equipment provided it ordered certain minimum quantities, and that Mostek would be liable for cancellation and rescheduling charges if it cancelled an order. The QPA also required Mostek to place all orders in writing.

The events leading up to the present action began on November 30, 1984, with a telephone order by Mostek for ten laser systems. Mostek, however, did not send the required written order until early January, 1985. By that time, there was no QPA in effect because the 1984 QPA had expired on December 6, 1984. Mostek had held off entering into a QPA for 1985 because it was experiencing financial difficulties and Teradyne had almost doubled the amount of equipment customers had to order to obtain a significant discount. Having revised its needs, Mostek reduced its January written order from ten laser systems to eight. Subsequently, on February 20, 1985, Mostek received a letter from Dick Chitowski, one of Teradyne's sales representatives, acknowledging receipt of the written order and enclosing a bill for cancellation charges for the two systems cancelled. Mostek disputed the validity of the charges and on March 20, 1985, Chitowski met with Jerome Harcharik (Harcharik), Mostek's chief purchasing agent, to try to resolve the matter.

The parties' characterization of what transpired at that meeting differ. Harcharik's affidavit states that Chitowski threatened that the systems ordered would be delivered on, what to Mostek was, an unacceptable schedule, if the cancellation charges issue was not resolved. According to Harcharik, Citowski "insisted" that Mostek enter into a QPA for 1985, and demanded, as consideration for Teradyne's waiving the cancellation charges, that Mostek place an order for twenty memory testers by April 1, so that Teradyne could book the order in its first quarter. Harcharik also stated that Chitowski told him Mostek could count its undelivered 1984 orders towards a 1985 QPA for discount purposes.

Teradyne denies that any undue pressure was put on Mostek at the March 20 meeting to enter into a QPA for 1985, though it concedes that its usual practice was to negotiate for new orders or equivalent value in lieu of pursuing cancellation charges. Indeed, Teradyne's treasurer, Stuart Ossatin (Ossatin) stated in his affidavit that Teradyne informed Mostek shortly before the date scheduled for delivery of the eight laser systems, that it could not deliver at the quoted price unless a 1985 QPA was signed. According to Ossatin, Teradyne's policy required that a QPA be in place at the time of shipment in order for the discount to go into effect.

Whatever the reasons or pressures exerted, shortly after the March 20 meeting, on March 26, 1985, Mostek did agree to enter into a QPA for 1985 and to place an order for twenty memory systems in the first quarter. The agreement provided for a retroactive effective date of December 8, 1984. As was the case under the previous QPAs, Mostek was required to choose the level of discount it wanted, the actual amount of discount then being

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

797 F.2d 43

797 F.2d 43

(Cite as: 797 F.2d 43)

Page 12

determined according to the quantity and dollar amount of the sales made. Mostek opted for the highest level of discount available, an 11% discount based on orders exceeding $7,000,000. Mostek was also required, under § 8 of the QPA, to select a cancellation option from alternative schedules of cancellation and rescheduling charges set forth in Schedule E attached thereto. The Schedule E form contained a line on which customers were required to indicate and initial their elected alternative and also stated that the alternative selected would be applicable unless the customer's purchase order specified a different alternative which would then be applicable to such order. One of the Schedule E alternatives was typed in on the line provided for customer selection when the 1985 QPA was executed. Contrary to its practice in executing the previous QPAs, Mostek failed to initial the selection this time.

Mostek's argument on the merits breaks down into two broad claims: (1) the U.C.C. argument, that Mostek is not liable for *55 cancellation and rescheduling charges because the cancelled orders were governed by the terms of Mostek's purchase orders, which, according to Mostek, allowed for cancellation at will; and (2) that the 1985 QPA, and the order for the twenty memory testers, were void because they were entered into as a result of economic duress imposed on Mostek by Teradyne.

1. *The U.C.C. Argument*

[4] Mostek claims that the 1985 QPA was not a contract, that it was merely a quotation of prices and a solicitation of offers, and that any contractual claim by Teradyne must, therefore, be based on the purchase orders. The purchase orders stated that they were offers to purchase goods at stated prices and delivery dates, and expressly limited acceptance to the terms of the offer. The termination portion of the orders stated that Mostek might cancel "at any time." Relying on § 2-207(2) of the U.C.C. and this court's interpretation of that provision in *Rotolith, Ltd. v. F.P. Bartlett & Co., Inc.*, 297 F.2d 497 (1st Cir.1962), Mostek contends that Teradyne could not materially alter Mostek's offered terms by imposing a cancellation provision.

Section 2-207 of the U.C.C. provides that an expression of acceptance or written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those agreed upon, unless acceptance is expressly made conditional upon assent to the additional or different terms. Section 2-207(2) provides that the additional terms are to be construed as proposals for additions to the contract and, between merchants, become part of the contract unless, *inter alia,* the offer expressly limits acceptance to the terms of the offer. [FN8] Mostek cites *Roto-Lith* as authority for the proposition that the additional terms, *i.e.,* the cancellation provisions, in Teradyne's "acceptance" of Mostek's "offer" could not become part of the contract because they materially altered Mostek's "offered terms." In *Rotolith*, we held that under § 2-207, a response which states a condition materially altering the obligation solely to the disadvantage of the offeror is an acceptance expressly conditional on assent to the additional terms. 297 F.2d at 500.

> FN8. Section 2-207 of the U.C.C. states:
> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
> (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
> (a) the offer expressly limits acceptance to the terms of the offer;
> (b) they materially alter it; or
> (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

In the alternative, Mostek argues that even if the terms of the QPA governed the orders, the cancellation provision would be unenforceable because Mostek did not initial a cancellation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

797 F.2d 43

797 F.2d 43

(Cite as: 797 F.2d 43)

Page 13

selection as required by Schedule E of the QPA. Mostek relies on the fact that Schedule E provided that the alternative selected would apply unless the customer's purchase order stated otherwise. Mostek claims that it initialed a cancellation selection in all the previous QPA and, therefore, that its failure to do so in the 1985 QPA, indicates a clear intention to make the terms of the purchase order apply. Finally, Mostek relies on its course of dealing with Teradyne in the past as indicating that there was no intention to have cancellation charges apply, claiming that it frequently cancelled orders in the past without having any such charges assessed against it.

Teradyne counters that § 2-207 does not apply on the ground that this case does not involve a situation where the offer and acceptance contain inconsistent terms. Teradyne contends that the 1985 QPA was not an acceptance of Mostek's purchase order offer, but rather, that it superseded *56 the terms of the purchase order as a new independent contract or a modification of the old, pursuant to § 2-209 U.C.C. [FN9] Teradyne points to the fact that the QPA was made retroactively effective to allow discounts to be applied to the earlier placed orders, and claims that, in essence, it agreed to allow the discounts to apply retroactively in consideration of Mostek's agreeing to the terms of the QPA. Teradyne contends further that it would still be entitled to recover even if the QPA was deemed not to supersede the purchase order terms, on the ground of repudiation.

> FN9. The five subsections of 2-209 provide:
> (1) An agreement modifying a contract within this Article needs no consideration to be binding.
> (2) A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party. (3) The requirements of the statute of frauds section of this Article (Section 2-201) must be satisfied if the contract as modified is within its provisions.
> (4) Although an attempt at modification or rescission does not satisfy the requirements of subsection (2) or (3) it can operate as a waiver.
> (5) A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

Teradyne does not address the significance of Mostek's failing to initial a cancellation selection, other than to point out that the provision for cancellation charges was conspicuously included in § 8 of the QPA which incorporated Schedule E by reference. It denies, however, that Mostek was ever allowed to cancel at will in the past. According to Teradyne, Mostek avoided paying cancellation charges in the past because it negotiated new orders with Teradyne in lieu of paying such charges, a course not open to it once it decided to wind down and eventually sell out.

After examining the contentions of both sides, we conclude that the trial court did not abuse its discretion in holding that Teradyne had a reasonable likelihood of success on the merits. Mostek makes no attempt to explain how the retroactivity of the 1985 QPA squares with its argument that § 2-207 of the U.C.C. applies. Its argument that it is not bound to pay cancellation charges because it did not initial a cancellation selection is also tenuous. Teradyne typed in a cancellation selection on the Schedule E form and thus clearly indicated its intention to assess such charges. It is not clear that this obligation should be deemed waived merely because the form was not initialed in the manner specified. Moreover, there is force in Teradyne's argument that it could recover for repudiation, even if not pursuant to the cancellation provisions, on the grounds of its plausible assertions that it incurred loss as a result of Mostek's cancellations because it had already

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

797 F.2d 43

797 F.2d 43

(Cite as: 797 F.2d 43)

Page 14

commenced production on the orders.

2. *The Duress Argument*

Mostek's alternative argument on the merits, that the 1985 QPA and the order for the twenty memory testers are void for duress, amounts to a broad assertion that Teradyne took advantage of Mostek's weak financial condition and used its position, as Mostek's only source of supply, to force Mostek to sign the QPA and to place the new order. Mostek also points to the pressure exerted on it by Chitowski, back in February 1985, to pay cancellation charges for cancelling two of the laser systems previously ordered by telephone. Teradyne now concedes that these charges were not due because cancellation charges were only assessable against written purchase orders.

Mostek's allegations of undue pressure exerted on it by Teradyne are rebutted to some extent by Teradyne's account of the facts which indicates that Mostek entered *57 the 1985 QPA voluntarily in order to obtain discounts on its 1984 orders and that it ordered the twenty memory testers of its own accord. But, even if the facts were as Mostek alleges, it is not clear that it has made out a *prima facie* case of economic duress.

It is well established that not all economic pressure constitutes duress, see *Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.,* 176 F.2d 799, 804 (1st Cir.1949), *aff'd,* 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed.2d 1312 (1950). The elements of duress under Massachusetts law, which both sides rely on in their briefs, are clearly set out in *International Underwater Contractors, Inc. v. New England Telephone and Telegraph Co.,* 8 Mass.App. 340, 393 N.E.2d 968 (1979). The court there held that a party alleging economic duress must show: (1) that it involuntarily accepted the terms of the other side; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party. 393 N.E.2d at 970. The court stressed that "[m]erely taking advantage of another's financial difficulty is not duress," that the person alleging financial difficulty must allege that it was "contributed to or caused by the one accused of coercion," and the assertion of duress "must be proved by evidence that the duress resulted from defendant's wrongful and oppressive conduct and not by plaintiff's necessities." *Id.* (quoting Williston, Contracts § 1617 at 708, *W.R. Grimshaw Co. v. Nevil C. Withrow Co.,* 248 F.2d 896, 904 (8th Cir.), *cert. denied,* 356 U.S. 912, 78 S.Ct. 669, 2 L.Ed.2d 585 (1958)). There is no indication here that Teradyne caused or contributed to Mostek's financial difficulties. Indeed, Mostek itself concedes that its difficulties came about as a result of a downturn in the semiconductor industry. Accordingly, we see no abuse of discretion in the trial court's conclusion that Teradyne had shown a likelihood of success on the merits.

*Affirmed.*

797 F.2d 43

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.